UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FRED TANTALO, JR.,

     Plaintiff,

v.

DEPUTY ANGEL BELTRAN,
DEPUTY ALFRED TINEO, DEPUTY
CRISTIAN TORRES, and DEPUTY
MICHAEL SHEROTSKI, each in their
individual capacities,

     Defendants.

Case No.

**JURY DEMAND**

## COMPLAINT

Plaintiff Fred Tantalo, Jr., by and through his undersigned attorneys, files this complaint against Deputies Angel Beltran, Alfred Tineo, Cristian Torres, and Michael Sherotski, each in their individual capacities.

In support, Plaintiff alleges:

## JURISDICTION AND VENUE

1. This is an action for money damages for the injuries suffered by Plaintiff as a result of Defendants' conduct in violation of Plaintiff's civil rights under the United States Constitution and Florida law.

2.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3.     Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Fourth Amendment to the U.S. Constitution.

4.     Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

5.     Venue is proper in this District under 28 U.S.C. § 1391(b), being the district where the claims arose and where Defendants conduct business.

## PARTIES

6.     At all times relevant, Plaintiff Fred Tantalo, Jr. is and was a resident of Rochester, New York, and is otherwise *sui juris.*

7.     At all times relevant, Defendant Deputy Angel Beltran was a sheriff's deputy for the Osceola County Sheriff's Office and is otherwise *sui juris*. Deputy Beltran is being sued in his individual capacity.

8.     At all relevant times during the events at issue in this case, Deputy Beltran was acting under color of law.

9.     At all times relevant, Defendant Deputy Alfred Tineo was a sheriff's deputy for the Osceola County Sheriff's Office and is otherwise *sui juris*. Deputy Tineo is being sued in his individual capacity.

10.     At all relevant times during the events at issue in this case, Deputy Tineo was acting under color of law.

2

11. At all times relevant, Defendant Deputy Cristian Torres was a sheriff's deputy for the Osceola County Sheriff's Office and is otherwise *sui juris*. Deputy Torres is being sued in his individual capacity.

12. At all relevant times during the events at issue in this case, Deputy Torres was acting under color of law.

13. At all times relevant, Defendant Deputy Michael Sherotski was a sheriff's deputy for the Osceola County Sheriff's Office and is otherwise *sui juris*. Deputy Sherotski is being sued in his individual capacity.

14. At all relevant times during the events at issue in this case, Deputy Sherotski was acting under color of law.

15. All conditions precedent to the filing of this action have occurred, accrued, or have been waived.

16. Plaintiff has been required to engage the services of the undersigned counsel and is entitled to an award of reasonable attorneys' fees and costs.

## **FACTUAL ALLEGATIONS**

17. Almost every year, Mr. Tantalo and his wife, Karen, travel from Rochester, New York to Florida for an extended vacation.

18. For their vacation in 2025, Mr. Tantalo—then 70 years old—rented a unit in Tuscana Condominiums, located at 1375 Tuscana Lane, Unit 1401, in Davenport, Florida (the "Apartment").

19.    On March 10, 2025, while Mr. Tantalo and his wife were in the Apartment, Deputies Torres, Beltran, Tineo and Sherotski responded to a request from the Polk County Sheriff's Office to "attempt to locate" (or ATL) a subject named Joel Salazar, who Polk County Sheriff's Office claimed had an active warrant for violation of probation stemming from a traffic-related offense.

20.    The ATL provided 1375 Tuscana Lane, Unit 3401, as Mr. Salazar's last known address.

21.    None of the deputies had a search warrant for Unit 3401 or any other location for Mr. Salazar.

22.    Deputy Torres arrived first on scene.

23.    Upon arrival Deputy Torres determined that Unit 3401 did not exist at 1375 Tuscana Lane.

24.    According to Deputy Torres, because building 1375 only had one unit ending in "401," he assumed that 1401 was the correct unit for Mr. Salazar.



25.   Deputies Beltran, Sherotski and Tineo arrived shortly after Deputy Torres.

26.   Deputy Torres told the other officers that he searched through Spillman, DAVID, and TLO for Mr. Salazar and the address and found <u>no direct link</u> between Mr. Salazar and the address. He located a photograph of Mr. Salazar, below, which he observed:



27.   Deputies Sherotski and Tineo also viewed the picture of Mr. Salazar before attempting to contact him.

28.   The officers did not verify occupancy or determine whether Mr. Salazar owned or rented, or was a guest in, any of the units or to determine whether a Unit 3401 existed.

29.   None of the officers contacted the Polk County Sheriff's Office, other staff at their agency, or any other resource to determine whether a Unit 3401 existed or whether the information provided for the ATL was accurate.

30.   Going only on an assumption that there was a scrivener's error in the ATL, the deputies proceeded to Unit 1401, with the false assumption that Mr. Salazar could be there.

31.   But he was not there.

32.   Instead, Mr. Tantalo and his wife were inside Unit 1401.

33.   At around 5:30 p.m., Deputy Tineo knocked and announced "Sheriff's Office" on the door to Unit 1401. The other officers were nearby observing.

34.   In response, Mr. Tantalo asked "who was knocking."

35.   At the time, Mr. Tantalo's wife was taking a shower in Unit 1401 and Mr. Tantalo had run the other shower and was preparing to get in.

36.   Deputy Tineo responded by announcing "Sheriff's Office."

37.   Mr. Tantalo responded "what do you want?"

38.   Deputy Tineo told Mr. Tantalo that he was there to speak with "Mr. Salazar," to which Mr. Tantalo responded "huh?"

39.   Mr. Tantalo responded that "we are taking a shower right now."

40.   Deputy Tineo told him that there was something they needed to speak to him about. Mr. Tantalo responded again "what do you want?"

6

41.    Mr. Tantalo repeated that they were not dressed and were showering and told them they could talk through the door.

42.    Deputy Tineo knocked again and then backed away.

43.    At this time, Deputy Torres had moved closer to the door, while Deputy Beltran stood at the far end of the hallway. Deputy Sherotski stood to the side of the door, about 20 feet away; he told the other officers he heard the sound of a shower curtain moving.

44.    During this encounter, Mr. Tantalo, a 70-year-old vacationer, was afraid and was not sure that it was really the police at his door or someone impersonating the police who planned to rob or harm him and his wife.

45.    Out of fear for his and his wife's safety, he called 911.

46.    While on the line with the 911 operator, Mr. Tantalo told them that "the guy just keeps pounding at my door." And "I don't know, he just says he is from the Sheriff's Department. I'm not opening the door; I don't trust them."

47.    Deputy Torres grabbed the door handle on Unit 1401 with his left hand and began pounding with his right. His pounding was so loud that another neighbor came outside from their unit.

48.    Eventually the 911 operator told Mr. Tantalo that "if they're pounding like that" on the door, "it's probably them," meaning the Sheriff's Office.

7

49.     Mr. Tantalo opened the door and then closed it. Mr. Tantalo then opened the door slightly again, while keeping the safety latch on.

50.     Deputy Torres approached the door and said "hello."

51.     Mr. Tantalo closed the door again and Deputy Torres pushed it open against the safety latch with his left hand while pointing his service weapon toward the door. Deputy Torres used his left foot to keep the door from closing and said "open up the door, upon up the door, Joel," referring to Mr. Salazar.

52.     Mr. Tantalo asked "are you from the Sheriff's Department?"

53.     Deputy Sherotski walked up, unholstered his firearm and used his foot to hold pressure against the bottom of the door. He told Mr. Tantalo that he *had* to open the door and step out of the unit.

54.     Deputy Beltran walked over as the door opened.

55.     Mr. Tantalo was inside the unit wearing a pair of red shorts and no shirt. He also did not look anything like Mr. Salazar.

 

56. Deputy Sherotski holstered his service weapon and Deputy Torres reached inside the residence and grabbed Mr. Tantalo's right wrist with his left hand as he holstered his service weapon with his other hand.



57. Deputy Sherotski then reached inside the residence with his right arm toward Mr. Tantalo's left side.

58. Neither deputy had a search warrant for Unit 1401 or any other location.

59. No exigent circumstances existed for any of the deputies to enter Unit 1401.

60. At no point did Mr. Tantalo consent to the deputies entering the premises or removing him from it.

61. No articulable facts supported any reasonable belief that Mr. Salazar resided at Unit 1401 or was present inside at the time of the entry.

62.    The only information the deputies had was another agency's ATL with no direct confirmation of the accuracy of the residence in the ATL.

63.    Further, the deputies *guessed* that the ATL contained a scrivener's error, and went to Unit 1401 solely based on this perceived error.

64.    Despite having no legal or reasonable basis to enter the home, Deputies Sherotski and Torres forcibly removed Mr. Tantalo from the residence. Deputies Beltran and Tineo stood by at the door watching their fellow officers pull Mr. Tantalo from the home.

65.    Deputies Beltran and Tineo failed to take any steps to stop Deputies Sherotski and Torres from forcibly removing Mr. Tantalo from the home.

66.    As the officers removed Mr. Tantalo from the residence, they could see that he was on the phone with the 911 operator.



67. Mr. Tantalo began screaming for help and explained that his name was "Fred Tantalo."

68. The officers told Mr. Tantalo that he was under arrest.

69. According to Deputies Beltran, Tineo, and Sherotski, they admit they had no basis to arrest, detain, or seize Mr. Tantalo, or go into the residence, but once Deputy Torres grabbed him, they believed they had developed reasonable suspicion or probable cause to arrest or detain him.

70. The deputies grabbed Mr. Tantalo by the ankle and leg, forcibly taking him down to the ground. Other deputies used force on Mr. Tantalo, pressing down with their body weight while he was on the ground. One of the deputies began forcibly yanking Mr. Tantalo's left arm, causing severe pain and injury.

71. Mr. Tantalo was forcibly taken to the ground by the deputies without justification, resulting in injuries.

72. Mr. Tantalo was then handcuffed.

73. At one point, Deputy Sherotski told him that they were there to talk to Mr. Salazar. Mr. Tantalo responded "I'm not Mr. Salazar."

74. Deputy Sherotski then blamed Mr. Tantalo for not telling him sooner; Mr. Tantalo explained that he could hardly hear what the deputies were saying because he was jumping in the shower.

75. Mr. Tantalo's wife came to the door and told the officers Mr. Tantalo had done nothing wrong. Deputy Torres told her that he failed to appear in court. She explained that he had never had any dealings with any court.

76. Deputy Torres told Ms. Tantalo to go back into the residence. She did and immediately called 911.

77. At this point, Deputy Torres opened his phone to look at the subject, Mr. Salazar, again.



78. While the other deputies were escorting Mr. Tantalo to the elevator to take him into custody, Deputy Torres then told the other deputies that Mr. Tantalo was not Mr. Salazar.

79. Deputy Tineo later admitted to OCSO that Messrs. Tantalo and Salazar did not look alike.

80. Despite learning that Mr. Tantalo was not Mr. Salazar, Deputy Sherotski continued to detain him and did not remove his handcuffs.

81.    Approximately three minutes later, the deputies removed the handcuffs from Mr. Tantalo.

82.    The deputies then left.

83.    A few hours after the incident, Mr. Tantalo was seen by emergency department staff at HCA Florida Poinciana Hospital for treatment for the injuries he suffered.

84.    Providers at the hospital diagnosed Mr. Tantalo with a closed head injury, contusions to the left shoulder, right elbow, both knees, and chest pain. In addition, Mr. Tantalo suffered exacerbations to existing chronic injuries, as well as, among other things, a torn rotator cuff requiring shoulder surgery, which was not fully successful.

85.    Below are some of the documented contusions that Mr. Tantalo suffered as a result of the incident:

 

 

86.    Further as a result of the incident, Mr. Tantalo also now suffers from anxiety, stress, and mental anguish. Mr. Tantalo also developed and was diagnosed with post-traumatic stress disorder as a result of the Defendants' actions.

### Count I – Invasion of Privacy Under Florida Law
**(against Deputies Beltran, Tineo, Torres & Sherotski)**

Plaintiff Fred Tantalo, Jr. repeats and re-alleges paragraphs 1 through 86 above, as if fully set forth herein and further alleges:

87.    The Florida Constitution provides for the right of the people to be secure in their houses against unreasonable searches and seizures. *See* art. I, § 12, Fla. Const.

88.    Deputies Beltran, Tineo, Torres, and Sherotski intentionally and with malice and bad faith invaded Mr. Tantalo's privacy in violation of state law, by

14

entering onto his private property without consent, a warrant, or exigent circumstances justifying the warrantless entry.

89. These defendants knew or reasonably should have known that there was no justification for their entry into Mr. Tantalo's residence because they did not have a warrant, exigent circumstances justifying warrantless entry, or permission from Mr. Tantalo to support the unlawful entry.

90. These defendants knew or reasonably should have known that their conduct—by entering Mr. Tantalo's home or by permitting others to do so without cause or justification—would naturally or probably result in injury and, with such knowledge, disregarded the foreseeable injurious consequences.

91. As a direct and proximate result of the actions by these defendants, Mr. Tantalo suffered and will continue to suffer in the future, damage to his reputation, mental pain and suffering, post-traumatic stress, physical injury, aggravation of preexisting injury, embarrassment, and humiliation, among other things.

WHEREFORE, Plaintiff Fred Tantalo, Jr. demands judgment against Defendants Beltran, Tineo, Torres, and Sherotski for compensatory and exemplary damages, costs of this action, and such further relief as the Court deems appropriate.

## Count II – Unlawful Entry in Violation of the Fourth Amendment
### (against Defendants Torres & Sherotski)

Plaintiff Fred Tantalo, Jr. repeats and re-alleges paragraphs 1 through 86 above, as if fully set forth herein and further alleges:

92.     At all times material, Defendants Torres and Sherotski were sheriff's deputies and law enforcement officers employed by the Osceola County Sheriff's Office and acting under color of state law.

93.     The Fourth Amendment to the United States Constitution is violated when a law enforcement officer enters a home without a warrant, exigent circumstances, or consent.

94.     At all times, Mr. Tantalo had a Fourth Amendment right to be free from unlawful entry into his residence, including searches and seizures resulting therefrom.

95.     These defendants abused their position as law enforcement officers when they reached into the residence without a warrant, exigent circumstances, or Mr. Tantalo's consent, and forcibly removed him from the residence.

96.     These defendants reached into the residence for the sole purpose of arresting another person based on a faulty assumption, and intentionally disregarded Mr. Tantalo's right to be free from unlawful entry into his residence and unreasonable searches and seizures stemming therefrom.

16

97.   These defendants knew or reasonably should have known that this conduct would naturally or probably result in injury and, with such knowledge, disregarded the foreseeable injurious consequences.

98.   The Fourth Amendment also encompasses the right to be free from the use of excessive force or detention during an unlawful entry into a residence, and in connection with an unlawful search or seizure arising therefrom.

99.   During the incident, Mr. Tantalo was subjected to excessive force.

100.   During the incident, Mr. Tantalo was subjected to detention and handcuffing.

101.   As a direct and proximate result of these defendants' unlawful entry in violation of the Fourth Amendment, Mr. Tantalo has suffered mental and physical injuries.

102.   These damages include but are not limited to: the violation of his federal constitutional rights, a deprivation of liberty, humiliation, physical inconvenience, pain and suffering, physical injury, aggravation of preexisting injury, emotional damage, mental suffering and anguish, post-traumatic stress, and all other damages associated with this constitutional violation.

103.   Mr. Tantalo has been required to engage the services of the undersigned counsel. Accordingly, he is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff Fred Tantalo demands judgment against Defendants Torres and Sherotski for compensatory and punitive damages, costs of this action, reasonable attorneys' fees, and such further relief as the Court deems appropriate.

### Count III – Failure to Intervene in Violation of the Fourth Amendment
### (against Defendants Beltran & Tineo)

Plaintiff Fred Tantalo repeats and re-alleges paragraphs 1 through 86 above, as if fully set forth herein and further alleges:

104.    At all times material, Defendants Beltran and Tineo were sheriff's deputies and law enforcement officers employed by the Osceola County Sheriff's Office and acting under color of state law.

105.    Defendants Beltran and Tineo were physically present at the scene when Deputies Torres and Sherotski forcibly removed Mr. Tantalo from his residence.

106.    They knew that there was no search warrant for the residence.

107.    They knew that there was no exigency or other circumstances that obviated the need to obtain a warrant to enter the residence.

108.    They also knew that Mr. Tantalo did not consent to the deputies entering the residence or removing him from it.

18

109. Despite observing Deputies Torres and Sherotski violating Mr. Tantalo's rights under the Fourth Amendment, Defendants Beltran and Tineo failed to take any steps to intervene or otherwise cease the unlawful conduct.

110. Further, despite the lack of cause to reach into the residence and forcibly remove Mr. Tantalo from this, these deputies participated in forcibly taking Mr. Tantalo to the ground, causing serious injuries.

111. Additionally, despite the lack of cause to reach into the residence and forcibly remove Mr. Tantalo from this, these deputies participated in detaining Mr. Tantalo and placing him in handcuffs.

112. None of the officers had a legal right to be present in Mr. Tantalo's residence for the purpose of making an arrest or establishing probable cause.

113. These defendants knew or reasonably should have known that his conduct would naturally or probably result in injury and, with such knowledge, disregarded the foreseeable injurious consequences.

114. The Fourth Amendment also encompasses the right to be free from the use of excessive force or detention during an unlawful entry into a residence.

115. During the incident, Mr. Tantalo was subjected to excessive force.

116. During the incident, Mr. Tantalo was subjected to detention and handcuffing.

117.   As a direct and proximate result of these defendants' failure to intervene in violation of the Fourth Amendment, Mr. Tantalo has suffered mental and physical injuries.

118.   These damages include but are not limited to: the violation of his federal constitutional rights, a deprivation of liberty, humiliation, physical inconvenience, pain and suffering, physical injury, aggravation of preexisting injury, emotional damage, mental suffering and anguish, post-traumatic stress, and all other damages associated with this constitutional violation.

119.   Mr. Tantalo has been required to engage the services of the undersigned counsel. Accordingly, he is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff Fred Tantalo demands judgment against Defendants Beltran and Torres for compensatory and punitive damages, costs of this action, reasonable attorneys' fees, and such further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Fred Tantalo hereby demands a jury trial of all issues capable of being determined by a jury.

Dated: June 3, 2026.

Respectfully submitted,

/s/ James M. Slater*
James M. Slater (FBN 111779)
Slater Legal PLLC
2296 Henderson Mill Rd NE #116
Atlanta, Georgia 30345
Tel. (404) 458-7283
james@slater.legal

Darryl A. Goldberg (FBN 761311)
Law Offices of Darryl A. Goldberg
33 N. Dearborn St., Suite 1830
Chicago, Illinois 60602
Tel. (773) 793-3196
dgoldberg@goldbergdefense.com

*Lead Counsel for Plaintiff

Attorneys for Plaintiff Fred Tantalo